Filed 8/11/25  Khoshaba v. California Department of Social Services CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| NAHRAIN KHOSHABA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, <br><br> Defendant and Respondent. | F087499 <br><br> (Super. Ct. No. CV-23-005619) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  John R. Mayne, Judge.

Prometheus Civic Law and Matthew Sean Harrison for Plaintiff and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown, Dane C. Barca, and Mary Mitchell, Deputy Attorneys General, for Defendant and Respondent.

-ooOoo-

Nahrain "Nina" Khoshaba ran a home-based daycare in Modesto.  After receiving complaints of violations of personal rights of children in her care as well as overcapacity violations over several years, the Department of Social Services (DSS) initiated a license revocation proceeding against Khoshaba.  After an administrative hearing, an

administrative law judge (ALJ) ordered the revocation of Khoshaba's license. Khoshaba filed a petition for a writ of mandate in superior court, which was denied. She appealed. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    Procedural Background**

In 2007, DSS issued a license to Khoshaba to operate a daycare facility in Modesto. The license provided: "Max Cap (when there is an assistant present): 12 – No more than four infants. Cap 14 – No more than 3 infants. 1 child in kindergarten or elementary school and 1 child at least age 6." (Capitalization omitted.)

In August 2022, DSS filed an accusation against Khoshaba alleging numerous violations of applicable laws and regulations and seeking to revoke her license and exclude her from employment in DSS-licensed facilities. DSS subsequently filed, in June 2023, an amended accusation containing similar allegations and similarly seeking license revocation and exclusion.

The matter proceeded to an administrative hearing before an ALJ on June 21 and June 22, 2023. The ALJ issued a proposed decision in July 2023. The ALJ found Khoshaba had committed a number of personal rights violations as to various children in her care. The ALJ further found that Khoshaba had provided inadequate supervision as to one child on one occasion. Finally, the ALJ found that, on at least five occasions, Khoshaba operated her facility over capacity and/or out of ratio. The ALJ concluded: "By violating the personal rights of children in her care, failing to provide adequate supervision, and disregarding ratio and capacity limits, [Khoshaba] engaged in conduct inimical to the health, morals, or safety of individuals receiving services from the facility."

The ALJ ordered: "1. Respondent Nahrain Khoshaba's license to operate a family child care home is revoked. [¶] 2. Respondent Nahrain Khoshaba is prohibited from employment in, presence in, and from contact with clients of, any facility licensed

2.

by the Department … until she successfully petitions for reinstatement."  In September 2023, pursuant to Government Code section 11517, subdivision (c)(2)(A), DSS adopted the ALJ's proposed decision in its entirety.

In September 2023, Khoshaba filed a petition for writ of mandate in the Stanislaus County Superior Court pursuant to Code of Civil Procedure section 1094.5.  In October 2023, Khoshaba filed an amended petition for writ of mandate.  In January 2024, the superior court issued a written order denying Khoshaba's petition for writ of mandate. This appeal followed.

## B.    DSS's Amended Accusation

DSS's amended accusation (accusation) noted:  "This matter arises under the California Child Day Care Facilities Act, Health and Safety Code section 1596.70 *et seq*., which governs the licensing and operation of family child care homes."  The accusation added:  "The regulations that govern the licensing and operation of family child care homes are contained in California Code of Regulations [(CCR)], title 22, section 102351.1 *et seq*."  The accusation clarified:  "The California Department of Social Services ('Department') is the agency of the State of California responsible for the licensing and inspection of family child care homes."  The accusation continued:  "The Department may … revoke any license pursuant to Health and Safety Code section 1586.885[.]"  The accusation further specified:  "Pursuant to Health and Safety Code sections 1596.887(b), 1596.889, and 1596.8897(e), the standard of proof to be applied in [a revocation] proceeding is the preponderance of evidence [standard]."

The accusation included allegations of personal rights violations (Health & Saf. Code, §§ 1596.885, 1596.8897; CCR § 102423); lack of care and improper supervision (Health & Saf. Code, §§ 1596.885, 1596.8897; CCR § 102417); operating over capacity or out of ratio (Health & Saf. Code, § 1596.885, 1596.8897; CCR § 102416.5); and engaging in conduct inimical to the health, morals, or safety of individuals receiving services at the facility (Health & Saf. Code, §§ 1596.885, 1596.8897; CCR § 102402).

3.

As to personal rights violations, the accusation alleged:

"On numerous occasions between 2012 and 2022, [Khoshaba] violated the personal rights of children in her care, including, but not limited to when she did the following:

"A.     On or about May 17, 2022, [Khoshaba] grabbed/slapped/hit CHILD #1, which resulted in the child sustaining swelling under the eye and bruising to the child's arm and face;

"B.     On or about October 25, 2018, [Khoshaba] slapped/hit CHILD #2, which resulted in injuries to the child's lips;

"C.     On or about October 25, 2018, CHILD #3 witnessed [Khoshaba] slapping/hitting CHILD #2;

"D.     On or about August 6, 2018, [Khoshaba] grabbed children in her care;

"E.     On or about August 24, 2017, [Khoshaba] grabbed/pinched CHILD #4's lips, which caused injuries to the child's lip;

"F.     On or about August 24, 2017, CHILD #5 witnessed [Khoshaba] grabbing/pinching CHILD #4's lip;

"G.     On or about March 18, 2014, [Khoshaba] left CHILD #6 strapped to a highchair alone in a closed room.;

"H.     On or about September 27, 2012, [Khoshaba] yelled at children in her care; and

"I.  On or about September 27, 2012, [Khoshaba] left infants in highchairs for long periods of time."

With respect to the allegation of lack of care and improper supervision, the accusation stated:  "On or about July 19, 2017, [Khoshaba] failed to properly supervise CHILD #7, when the child hit his head in the bathroom, resulting in the child having a bump on the forehead.

With respect to allegations regarding operating the facility over capacity and out-of-ratio, the accusation stated:  "On numerous occasions between 2011 and 2018, [Khoshaba] operated the Facility overcapacity and/or out-of-ratio, including, but not

4.

limited to the following dates:  [¶] August 6, 2018; [¶] November 15, 2017; [¶] September 14, 2017; [¶] November 10, 2011; and [¶] June 2, 2011."

The accusation further stated:  "Respondent engaged in conduct that is inimical to the health, morals, welfare, or safety of either an individual in or receiving services from the facility, or the people of the State of California as alleged [above]."

The accusation noted, as "matters in aggravation," that Khoshaba attended two non-compliance conferences, in 2019 and 2022, to address some of the issues detailed in the accusation.

The accusation sought revocation of Khoshaba's daycare license and exclusion of Khoshaba from employment in any DSS-licensed facility.

## C.  The Administrative Hearing (June 21-22, 2023)

An administrative hearing was held before an ALJ on June 21 and 22, 2023.  DSS presented four witnesses:  Joseph Pacheco (DSS analyst), Gladys Nicole Williams (daycare parent), Christina Favela (daycare parent), and Amanda B. (daycare job applicant).  Khoshaba testified on her own behalf and also called Kelly Buttram, an assistant and teacher at her daycare; J.C. ( a minor who had formerly attended her daycare for several years); and Eris Brown, Darlene Tyler, Jennifer Gaspar, Ivan Garcia Juarez, Marissa Wyatt, Angelica Flores, Chandray Whitten, and Alyssa Figueroa, all of whom had children who had attended her daycare.  We will summarize the evidence presented at the administrative hearing as relevant for our analysis.

### 1.  DSS CASE

*Testimony of Joseph Pacheco*

Joseph Pacheco worked as a Licensing Program Analyst (LPA) for the State of California Department of Social Services Community Care Licensing Division, starting in March 2019.  Pacheco testified that Khoshaba was "licensed to operate a large family child care home in Modesto, California."

<u>Personal Rights Violations</u>

Pacheco testified DSS received a complaint regarding Khoshaba's daycare on May 19, 2022. (Ex. 2 (the subject incident allegedly took place on May 17, 2022 and was reported by Gladys Nicole Williams (see below)).) The "allegation was that [the] licensee abused a daycare child [Child 1] by slapping, choking, and swinging the child to the floor." Pacheco investigated the complaint. He interviewed Khoshaba, Kelly Buttram (Khoshaba's assistant), the complainant, daycare children, and daycare parents. He also considered the history in Khoshaba's file. Pacheco further testified: "I also spoke with a City of Modesto police officer and a Stanislaus County social worker. We also reviewed a report from the Modesto Police Department, as well as a medical report that was provided by the Complainant." Ultimately, "[t]he allegations were substantiated." Pacheco explained the reasons for substantiating the allegations: "So in speaking with the mother [the complainant], we found her statements to be credible and they were supported by the medical report received along with the police report. [¶] Also, interviewing the assistant Kelly, her statement supported the mother's statement. And given the history from the file review, we found a substantiated finding."

Pacheco further testified regarding a complaint DSS received on October 29, 2018. (Ex. 3 (the subject incident allegedly took place on October 25, 2018).) "That complaint alleged that Ms. Khoshaba had abused a daycare child [Child 2] by hitting the child in the mouth and refusing to let the child use the restroom." Pacheco testified: "The [LPA] assigned to that complaint spoke with the child's mother, who had observed red marks on her child's lips and had spoken with her child. [¶] This child stated that [Khoshaba] had hit her and that another child witnessed the incident. The child who witnessed the incident [Child 3] told his mother that he saw Ms. Khoshaba hit the child in the mouth." Pacheco noted: "The allegation that Ms. Khoshaba hit a daycare child was substantiated, but the agency determined that the allegation about Ms. Khoshaba refusing a child to use the restroom was unfounded." Pacheco observed: "What stuck out to me,

6.

according to the reports, was that Ms. Khoshaba hit a child in the face, specifically the lips. And that's, you know, doing a file review, many of the allegations regarding Ms. Khoshaba involved her grabbing or hitting a child in the face or pinching lips."

Next, Pacheco testified about a complaint that DSS received on August 6, 2018. (Ex. 4 (the subject incident was reported by Amanda B. (see below) and allegedly took place on August 6, 2018).) "That complaint alleged that Ms. Khoshaba was physically aggressive with children in care and she spoke inappropriately to children and she was operating the daycare over capacity." The LPA assigned to the matter interviewed both the complainant and Khoshaba. Ultimately, "[t]he allegation that Ms. Khoshaba was operating over capacity was substantiated, but the other allegations involving her being physically aggressive with children in care and speaking inappropriately to children in care were unsubstantiated." Pacheco clarified: "[A]ccording to the department's definition, unsubstantiated means that the allegation may have happened or is valid, but there is not a preponderance of the evidence to prove that the alleged violation occurred." Pacheco observed: "[O]ne of the allegations was that Ms. Khoshaba grabbed the child's face. You know, many of the allegations regarding Ms. Khoshaba involved her grabbing or hitting a child in the face or pinching lips." (Ex. 5.)

Pacheco also testified about a complaint received by DSS on September 8, 2017. (Ex. 6 (the subject incident allegedly took place on August 24, 2017).) Pacheco stated: "The complaint alleged that Ms. Khoshaba had pinched a child's lips [Child 4]."[1] Pacheco noted that the LPA assigned to the matter spoke with the complainant and went out to the facility to speak with Khoshaba. Ultimately, the allegation was found to be unsubstantiated. Pacheco indicated this complaint, like a number of others, involved an allegation of Khoshaba pinching a child's lips.

---

[1] The documents in evidence regarding this complaint indicate that Khoshaba allegedly pinched Child 4's lower lip causing it to bleed and that this occurred in the presence of Child 4's older, four-year-old brother (Child 5).

7.

Pacheco testified about a violation personally observed by a DSS LPA during a case management visit to Khoshaba's daycare on March 18, 2014. (Ex. 7.) "According to the report, the violation was over a situation where Ms. Khoshaba left a two-year-old child [Child 6] alone in a playroom with the door closed, and the child was also strapped in a high chair. [¶] The child was alone in that room with a television on and a sippy cup in front of them." Khoshaba was cited for the personal rights violation observed by the LPA. Pacheco was asked whether there was anything notable about the highchair incident observed by the LPA. Pacheco responded: "Well, besides the fact that, you know, it's an extremely dangerous thing to leave such a young child alone in a room, there seemed to be other complaints over the years of Ms. Khoshaba leaving children strapped in high chairs for long periods of time. So, a pattern."

Pacheco further testified about a complaint received by DSS on October 2, 2012. (Ex. 8 (the subject incident allegedly took place on September 27, 2012).) Pacheco stated: "So this particular complaint alleged that Ms. Khoshaba would point her finger in children's faces and yell at them. She left children in high chairs for long periods of time, and that the facility was operating out of ratio." He continued: "[T]he [LPA] interviewed Ms. Khoshaba and her assistant and also parents of the children in the facility." He added: "[T]he findings of those allegations were deemed as inconclusive." He observed: "[However], the allegations were pretty consistent with complaints that were received in later years."

<u>Inadequate or Improper Supervision</u>

Pacheco testified about a complaint received by DSS on August 30, 2017. (Ex. 9 (the subject incident allegedly took place on July 19, 2017).) He stated: "So the complaint alleged that Ms. Khoshaba failed to prevent an unexplained injury to a child [Child 7] in her care. Apparently, Ms. Khoshaba had told the reporting party that the child apparently slipped in the bath[tub] and bumped their head." However, when DSS's LPA spoke to Khoshaba in investigating the complaint, Khoshaba "gave a different story

8.

as to what happened to the child." Pacheco continued: "According to the [LPA], [Khoshaba] said that [Child 7] was placed on the toilet after he had a bowel movement accident. [¶] And then while she began to help another child in the bathroom, [Child 7] got up from the toilet and tripped on a step stool in front of them and hit their head on the shelf." Pacheco noted that ultimately, "[t]he findings of the complaint were unsubstantiated."

<u>Operating the Facility Over Capacity and Out of Ratio</u>

Pacheco testified about a case management inspection conducted by a LPA on November 15, 2017. (Ex. 10.) He testified: "[D]uring that inspection, it was observed that the facility was out of ratio, operating out of ratio or over capacity, and that Ms. Khoshaba was left alone with ten children in her care."[2] The LPA's report stated: "LPA observed ten napping children alone with licensee. Licensee stated her assistant had to leave to pick up her children from school at approximately 2:20 p.m. [¶] The assistant arrived back at the home at 3:00 p.m. and licens[ee] was within ratio capacity."

Next, Pacheco testified about a case management inspection conducted by a LPA on September 14, 2017. (Ex. 11.) Pacheco testified: "During that inspection, it was found that the facility was operating out of ratio and capacity. Ms. Khoshaba was alone with 12 children in her care at that time." The LPA personally observed the overcapacity violation at the facility.

Pacheco further testified about "a random inspection that [a DSS LPA] conducted on [November 10, 2011]." (Ex. 12.) "During the inspection, it was found that the facility was out of ratio and capacity. Ms. Khoshaba had 13 children in her care with four infant-age children and no kindergarten or school-age children present." Pacheco explained: "So in order for [her] capacity to be that high, there has to be school-age children present.

---

**2** Khoshaba subsequently testified that she was permitted to be alone with no more than eight children at any time.

9.

One of the children has to be at least in kindergarten, and the other would have to be … attending first grade." In other words, there were more children under the age of five present than were allowed under Khoshaba's license.

Pacheco testified about a case management inspection conducted by a DSS LPA on June 2, 2011. (Ex. 13) "During that inspection, the facility was found to be operating over capacity or out of ratio. Ms. Khoshaba was alone with nine children in her care at that time."

### Matters in Aggravation

Pacheco testified that Khoshaba attended noncompliance conferences with DSS on August 4, 2022, and February 8, 2019. (Exs. 14, 15.) After the August 2022 noncompliance conference, DSS "felt that the problems at the facility were serious enough to send [the matter] to the legal division to seek revocation of Ms. Khoshaba's license."

### *Testimony of Gladys Nicole Williams*

Gladys Nicole Williams testified that Khoshaba had been the daycare provider for Williams's son. Williams removed her son from Khoshaba's daycare after an incident on May 17, 2022. On May 17, 2022, Williams arrived at the daycare to collect her son. Williams testified: "As I walked into the door, I see [Khoshaba] slapping my son on the face. And she went and like took her arm over him. He was facing me and she like slammed … him … in the back and, like, she slammed him back….[¶]..And … when she slapped him in the face, he had no idea, like, it was coming. He just – she just slapped him in the face. And then as they were coming up, I grabbed my son, and I said, you will never fucking watch my son again. And I grabbed him. [¶] Sorry about the language, Your Honor, but that's what I said."

Williams was asked what Khoshaba said at that point. Williams testified: "At that point, she didn't even know I had walked in the door. Like, she didn't even notice, like she was oblivious to everything. And she was just like, oh, he pooped, he pooped, he

10.

pooped. [¶] But she wasn't even changing his diaper. Like, she was angry with him for pooping."

DSS's attorney and Williams then had the following exchange:

"Q. Now, Ms. Khoshaba told the [LPA] investigating that she – that what you saw was just her falling down with her son – your son because your son was trying to run to you. Is that what you saw?

"A. No. My son did not even know I was there. When I picked him up, he was hysterical, crying, and then he looked at me, like, and he was just, like, oh, okay, it's you, like – but he did not know I was in the building at all. [¶] She did not know. Both of them did not know I was in the building."

"Q. They didn't see you when Ms. Khoshaba put – threw your son down to the ground?

"A. No.

"Q. Okay.

"A. Even as I walked in when she was slapping him in the face, she did not even know I was there.

"Q. Okay. And did Ms. Khoshaba explain to you at any time later what she was doing to your son at that point?

"A. After I grabbed him and said what I said to her, she ran outside and said, I was changing his diaper, he pooped, he pooped. But she was not changing his diaper at all.

"Q. Okay. What did you do after you took your son from the facility?

"A. I drove home to my house. I did look at his diaper. He did poop. And then I – then I called 911 –

"Q. Did you –

"A. – and report –

"Q. – did you look at your son's face to see if there were any marks on his face?

11.

"A.     Yes, I did.  And there were marks.  So I – immediately after that, after calling 911, I took him to the emergency room.

"Q.     And what did the emergency room do?

"A.     They checked him and they also said there was also bruising on his face.  There was marks from her slapping him."

Williams was asked whether she yelled when she walked into the daycare and saw her son being slapped.  Williams answered:  "No, I was so shocked.  I was – and when I walked in, she was slapping him in the face, and then she slammed him down on the ground, and as they were coming up, I grabbed my son, and then that's when I yelled at her.  And then I took my son and I grabbed him."

Williams was further asked:  "Do you think it's possible that he could have suffered an injury when you grabbed him?"  Williams responded:  "No.  I grabbed him underneath his arms and no, he did not have any injuries.  They looked up everything in the – when I took him to the emergency room.  [¶]  The only injuries that he had was the slap on the face and the choke [that] they saw, like, around the neck."

Williams also clarified that subsequently her son, who has "a speech delay," would "get nervous just driving by" the daycare, which they sometimes did because they lived "not that far from [Khoshaba's] house."

### Testimony of Christina Favela

Christina Favela testified that Khoshaba "provided care for both of [her] boys since about the summer of 2020."  Favela testified that she had a few concerns about the care her children received at Khoshaba's daycare.  Favela's older child, a picky eater, was forced to eat, including foods he did not like.  Favela "would explain to [Khoshaba] continuously, don't make him eat."  Favela testified:  "[My son] was – from what I understand, he was like, laughing, like, opening his mouth and she shoved French Toast down his mouth."  Favela continued:  "I was just, like, so frustrated as a parent that my wishes were not being respected."  Favela added:  "And I believe she would even not let

12.

him engage in activities." Favela texted Khoshaba, stating: "[I]t breaks my heart to know that you're sitting him out o[f] activities because he's choosing to not eat … [¶] … Respect his wishes, if he doesn't want to eat. Do not sit him out from activities."

Favela further noted: "The other thing that's always really bothered me, and something else I spoke to [Khoshaba] about, my – again, my oldest [child], has a condition called torticollis where his neck – his right neck muscle didn't develop at the same rate as his left side, so his head naturally tilts to the right. [¶] Nina pointed this out so much, so much so that my son would come home and say, Mommy, is my – is my head crooked?" When Favela would ask her son why he was asking, he would respond: "Because Nina tells me my head's crooked and she makes me move my head." Favela continued: "And I told [Khoshaba], and she was again, so adamant that I need to put a neck brace. I've told her I'm taking him to physical therapy. I'm working with his doctor on it." Favela added: "And it drives me insane that I'm not there to protect him at that moment. I told her, stop pointing it out. Stop."

Asked whether she had any additional concerns, Favela testified: "[W]hen I would get there to pick up my baby, my youngest, who's three and a half and he was napping, she was just so like – so, like abrupt in how she would, like, get him out, out of the little cot. Just, like, pulling his arm to get up. [¶] And it's, like – at that point, it's, like, okay, I'm not going to let her pick him up. Like, let me walk over to my son and I'll pick him up. And she's – and granted he's asleep. So he's like, what the heck is going on? Right? [¶] He's just, like, just in a daze. And it's – and she's, like, don't make noise. You're going to wake up the other kids. And it's, like, I'm not trying to make noise, but I'm just – I'm trying to, like, get my son up. [¶] You know, I understand – I understand nap time is a crucial time. It's a blessing. But like, I did not like how she would grab him by the arm to pull him out of his cot."

One day, all of a sudden, Khoshaba texted Favela at 6:08 a.m. stating she could not watch Favela's child anymore and that yesterday was his last day. Favela concluded:

13.

"[I]f anyone was to ask me right now if I have any recommendations of a daycare provider, I would say no."

***Testimony of Amanda B.***

Amanda B. was asked how she knew Khoshaba. Amanda B. replied: "I don't know her personally. I just went for an interview. She had posted that she was hiring for an assistant, and so I went for an interview."

Amanda B. had the following exchange with DSS's counsel:

"Q. Okay. When you were at the facility, did you notice anything at the facility that might have concerned you?

"A. Yes. So I was there for maybe only an hour, and right away, I started to feel uncomfortable. She was just being really aggressive, saying, I feel like, inappropriate things in front of the kids. Yeah. She's just – she was just being really aggressive towards them.

"Q. And when you say she was aggressive towards the kids, what – how was she aggressive?

"A. Like, sitting them down, grabbing them by the arm, and how they were going to do Circle Time, sitting them, grabbing a face – a student by the face, kind of, like, look at me and turning them really hard, enough for them to start crying. Just things like that.

"Q. Did you – did you happen to see any behavior during snack time that concerned you?

"A. Yes. I felt like she was kind of rushing them to eat, and therefore, she was, like, shoving, like kind of shoving the food in their mouths, like, enough for, like, where their head was going back.

"Q. Ok. And when you say that she was making inappropriate comments, what kind of comments did you hear her say?

"A. Just saying things like, I mean, I feel that are inappropriate, like she was calling a young boy China, a Chinese boy. She was calling him China. That wasn't his name. Saying things, like – there was a little blonde girl, like, right in front of her, like, oh, I never liked blondes, like, saying things about blondes. And I just felt like it was really inappropriate because the children are right there listening and –

14.

"Q.     And when you went to the facility, was Ms. Khoshaba taking care of the kids by herself?

"A.     I believe so.

"Q.     Okay.  And did you notice whether or not Ms. Khoshaba was within the requirements – or how many children do you believe she was caring for at the time that you went there?

"A.     Maybe – I mean, it was so long ago – maybe 20 – 18 to 20.

"Q.     And there's a report that indicates that a complaint came – that a complaint came in at around August of 2018.  Does that sort of suggest to you about the time that you made your complaint?

"A.     Yes.

"Q.     Okay.  Would you put your children in Ms. Khoshaba's daycare?

"A.      No, never.

"Q.     And how many children do you have?

"A.     I have four."

Amanda B. testified that Khoshaba offered her the job, but she turned it down. DSS's attorney asked:  "Just to clarify, would you have wanted to work at this daycare?" Amanda B. responded:  "No.  No.  And like I said, I was only there for an hour, and I have never – I've been working in this field for more than eight years.  I have never felt the need to call and report a place, but as soon as I stepped out of there, I have – I didn't even leave her driveway, and I made the phone call.  That's how uncomfortable I felt in that hour."

**2.     Khoshaba's Case**

*Testimony of Nahrain Khoshaba*

Khosahaba testified on her own behalf.  Khoshaba's counsel asked her how many of the children who had attended her daycare were "unhappy or dissatisfied" with the daycare.  Khoshaba responded:  "All the kids are happy with me because I know what they want.  I do it for them.  And when – if the parent's not happy, they have their own

issue. [¶] Either their issue is they don't wash their kids every day or every other day. Like one of the kids, I don't know if I should mention the name, it passed two weeks; no shower on the head."

Khoshaba's counsel asked her about the "few different occasions in the past" when her "daycare was overcapacity." Khoshaba answered: "Yes, overcapacity is because parents, they drop their kids at 5:20, 5:40, 5:45, and they work eight hours, give them 45 minutes lunch. They have to be away only nine hours. I had a couple of kids. They come at 5:45. They don't leave till 5:00, 5:30. [¶] I have to call the parents, they don't answer, I have to text message." Khoshaba continued: "And that's why I got overcapacity because these three kids or four kids, they have to leave at 2:45. And they come at 5:30, 5:34, and they have eight to nine hours; then they have to leave. [¶] But the parents, they take advantage, they don't come pick them up, and I get overcapacity." Khoshaba stated she had made changes like making rosters putting "a note in front to all the parents" asking them to "please be here on time, pick up your kids." As a result of these changes she had not been over capacity in a "[l]ong time."

Khoshaba's counsel asked her how many parents had been "dissatisfied or unhappy" with her daycare in the time she had run her daycare. Khoshaba answered she had disputes with parents over things like the use of pacifiers. Khoshaba testified: "I don't believe in speech therapy till you take the pacifier out of [the child's] mouth." Khoshaba testified she told a parent, Nicole Williams: "I don't believe in pacifiers. He's old enough, no baba, no pacifier."

Khoshaba's counsel asked her about an August 24, 2017 incident, in which Khoshaba allegedly pinched Child 4's lower lip causing it to bleed, in the presence of Child 4's older, four-year-old brother (Child 5). DSS received a complaint about this incident on September 8, 2017. (Ex. 6.) Khoshaba's counsel stated: "[C]an you just describe what happened that day if you remember?" Khoshaba replied, "Nothing. I'll be honest with you, nothing happened at all." Khoshaba added: "I don't know what

16.

happened. [The mom] went and she was so upset. She came and picked up the boys. She even [held] them with all their waist under her arms walking." On cross-examination, Khoshaba was asked: "On August 24th, 2017, did you grab or pinch [Child 4's] lips?" Khoshaba responded: "I don't grab and hit and [pinch] lips, no, ma'am." Khoshaba stated the mother was making it up.

Khoshaba's counsel asked Khoshaba about an incident that occurred on October 25, 2018 (DSS received a complaint about it on October 29, 2018), in which Khoshaba hit Child 2 in the mouth, in the presence of Child 3 (Child 3 told his mother he witnessed the incident). (Ex. 3.) Khoshaba testified that on the day in question, Child 2's mother brought in a breathing machine and asked Khoshaba to have Child 2 utilize it. Khoshaba testified, "as soon as [Child 2] saw that box [i.e., the box containing the breathing machine], she started panicking." Khoshaba testified she did not have the child utilize the breathing machine. Khoshaba testified: "So [the mother] was mad. She took [Child 2]. Whatever she did in the car, I think the baby, she says she peed on a car seat." Khoshaba denied hitting Child 2, stating, "I don't like to hurt nothing." Khoshaba stated that Child 2 "always bites her lips, yeah," and further noted, "I wouldn't touch a soul." On cross examination, Khoshaba was asked: "[D]id you slap or hit [Child 2]?" Khoshaba responded, "No." Khoshaba added: "I never touch children." With regard to Child 3, who allegedly told his mother he saw Khoshaba hitting Child 2 in the mouth, Khoshaba stated that Child 3's mother pulled Child 3 out of the daycare under duress from Child 2's mother. Khoshaba also stated: "[Child 3] didn't even know how to talk."

Khoshaba's counsel asked Koshaba about the May 17, 2022, incident involving Child 1, who was allegedly slapped, choked, and swung to the floor as witnessed by his mother, Gladys Nicole Williams. Williams reported the incident to DSS on May 19, 2022. (Ex. 2.) Khoshaba testified: "So I [had] my right hand under the – and the left one on the – on [his] head to put him down. He saw his mom walk in and he went, mommy, mommy, and still my arm is there and – no, mommy, mommy. [¶] And as

17.

soon as he tried, we both fall down. I was on my knees. We both fall down. I even had poop all over my shirt because I wanted to change him."

Khoshaba continued: "And [the mom] started screaming, let him go. I said, Nicole, I have to change his diaper. She said, no, let him go. She came over and she goes, let's go. [¶] Nina, you'll never see him again. I said, why, Nicole, let me change his diaper. And I took the diaper and wipe and run after her. [¶] Nicole, his diaper's all the way – it's up to his back." Khoshaba added: "She just took off. I didn't know what happened. And then the police came in and they told me that she called the cops." On cross-examination, Khoshaba was asked: "Do you deny that you grabbed, slapped, hit … [Child 1]? Khoshaba responded: "I never slap and hit anyone." Later, Khoshaba was again asked whether she had hit Child 1. Khoshaba responded: "I never touched him."

Khoshaba also denied she had grabbed children in her care on August 6, 2018 (as reported to DSS by Amanda B., who had come to the daycare for a job interview).[3] In addition, Khoshaba was asked: "On March 18th, 2014, did you leave [Child 6] … strapped to a high chair alone in a closed room?" Khoshaba responded: "That's a lie. No one was strapped … I don't like straps on high chairs." When it was pointed out that the LPA had personally witnessed this incident, Khoshaba retorted: "Why didn't he do something about it if he cares about child[ren]?" Khoshaba added: "There was no such thing." DSS's attorney noted that the LPA's report further stated: " 'Licensee brought the child in the highchair into the living room, and the assistant removed her from the

---

[3] With regard to Amanda B., Khoshaba stated: "She's lying. She never saw me grab any kids because she didn't get the hours she want. She want to get me in trouble. Or she was somebody that she came directly to my daycare just to do that. But the kids I have in my daycare, they're my life."

chair.' " Khoshaba countered: "No, [all this] did not happen."**4** Khoshaba denied the other allegations of personal rights violations in the accusation as well.

Khoshaba was further asked as to the improper supervision allegation in the accusation: "On July 19th, 2017, did you fail to properly supervise [Child 7] when he hit his head in the bathroom?" Khoshaba responded: "No, I did not fail at all. He was in the bathroom sitting and there is a stool underneath his feet. When he stand up, I was helping someone else to my left and he stood up and he put – and he went straight on the wall because [there's] not too much space between toilet and the wall." Khoshaba said Child 7 did not fall; rather he put his hand out to the wall for support. Khoshaba noted: "I was turned around … helping the other kid putting their pants on, and [Child 7] was right behind me. I was in between two kids[,] sitting on the floor." DSS's attorney then stated: "Well, that's very interesting because you had said that [Child 7] had pooped his pants and you were cleaning him off of the poop at the time he was in the bathroom. So why would another child be in the bathroom going to –[the bathroom]?" Khoshaba denied she had ever said that Child 7 was in the bathroom because he had pooped; Khoshaba retorted, "don't make up stories."**5**

---

**4** DSS's attorney then asked: "So the LPA is lying when the LPA put this down in the report?" Khoshaba answered: "I don't remember never this happened. Strapped a child on a highchair and put him in a room and closed the door, and – oh, no, no, no. I can't do that. I'm sorry. Never happened." DSS's attorney came back: "Okay. So the LPA has to be lying about this incident, correct?" Khoshaba replied: "I believe so because it never happened. Why didn't he do something about it?"

**5** However, documentation entered into evidence by DSS indicates that Khoshaba had told Child 7's mother that Child 7 had slipped in the bathtub and bumped his head. Specifically, a complaint was made to DSS about the incident on August 30, 2017, as follows: "[Mother] states when she picked up [Child 7] from the facility at about 5:30 PM on 07/19/2017, she noticed a bump on his forehead. Licensee told [mother] [Child 7] slipped in the bathtub and bumped his head. Once [mother] got home, she noticed more marks on [Child 7] and became concerned. [Mother] contacted Licensee, who claimed the marks were scratches from other children, sustained while [Child 7] was

19.

DSS's attorney then turned to the overcapacity violations alleged in the accusation. DSS's attorney and Khoshaba had the following exchange:

"Q. ….Let's go to … August 6th, 2018 [the day that Amanda B. was at the daycare for a job interview]. Were you overcapacity or out of ratio on that date?

"A. Yes. When the parents – yes. [¶] … [¶]

"Q. ….[D]o you remember how many children you were overcapacity by?

"A. No, because I'm always okay. I'm always right.

"Q. What do you mean, you're always okay and always right?

"A. I know because I take care of my business. I know what I'm doing. I can be overcapacity or, you know, but no.

"Q. Well, I asked you how much were you overcapacity or out of ratio on August 6, 2018?

"A. I don't remember.

"Q. On November 15th, 2017, were you overcapacity or out of ratio?

"A. What year was that?

---

playing. [Mother] took pictures of the injuries … and contacted law enforcement." DSS received the photos, which showed "marks, bumps and bruising."

Subsequently, on November 15, 2017, LPA Claudia Henley conducted an unannounced complaint inspection at Khoshaba's daycare. Henley reported her investigation findings as follows: I was met by licensee. A previous visit was conducted on 9/16/17 and licensee and assistant [were] interviewed on this date. Licensee stated that she and [Child 7 were] in the restroom. [Child 7] was placed on the toilet while licensee was cleaning him up from a bowel movement accident. Licensee stated that while she was assisting another child in the restroom, [Child 7] got up from the toilet. Licensee stated that [Child 7] tripped on the stool step in front of him hitting his head on a floor shelf that was near the tub & toilet area. Licensee stated that the child sustained a bump on his forehead from the fall. Licensee stated that she notified the parent regarding this injury … [¶] Although the allegation may have happened or is valid, there is not a preponderance of evidence to prove the alleged violation did or did not occur, therefore the allegation is unsubstantiated."

20.

"Q. 2017.

"A. Maybe I have been, but the licensing unit, they said I've been, but I'm always okay. I've never been overcapacity."

DSS's attorney went through all the overcapacity/out-of-ratio violations listed in the accusation: June 2, 2011, November 10, 2011, September 14, 2017, November 15, 2017, and August 6, 2018. Khoshaba never gave a straight answer.

For example, DSS's attorney further discussed the allegation that Khoshaba was over capacity on August 6, 2018. Khoshaba's roster for that day indicated at least 12 children were at the daycare that day, at a time when Khoshaba was alone, evidently because her assistant, Kelly Buttram, had to leave to attend to an emergency. Khoshaba testified that after Kelly Buttram left, Kohshaba "called all the parents to come pick up their kids." DSS's attorney had the following exchange with Khoshaba regarding that situation:

"Q: ….[H]ow many children could you be alone with?

"A. I could be alone with eight kids.

"Q. Eight kids. So being alone with 12 kids was certainly above capacity and certainly more than one above capacity, correct?

"A. (Inaudible) has to come and pick up their kids. One of them, she said, Nina, I'm driving from Stockton. The other one, Nina, it's traffic. Nina, I wish you could have called me earlier. [¶] What do you want me to do? Open the door, tell the kids, leave? I'm overcapacity? Common sense.

"Q. No. I'm asking you to be honest about when you're overcapacity. That's all I'm asking you to do.

"A. Emergency happens. What would you do?

"Q. You make a report of it, you admit to it, you don't lie about it.

"A. I'm not lying. I don't like to lie. And I don't like to hear people lying. Make up stories.

"Q. Well, that's what I'm trying to get to. You are saying that you called all the parents and told them to come get the kids. Clearly, they didn't

21.

because the time outline indicates they came long after Ms. Kelly left your facility.

"A. Yes, after that, I told the parents completely. Now, I'm completely straight with the parents. Please, if you really still want me to have a daycare, come pick up your kids on time. I can't afford citation. So now, everybody's on time. Because I showed them what I go through with the licensing and now with you."

DSS's attorney moved on to discussing the overcapacity violation alleged in the accusation for September 14, 2017, when Khoshaba was alone with 11 children. Khoshaba responded she called backup help that day, stating, "I always call backup." DSS's attorney then showed Khoshaba a report from an LPA who went to the daycare on September 14, 2017. (Ex. 11.) DSS's attorney stated: "[I]t says the LPA got there at 12:10 p.m. and observed that there were 12 napping children alone with you, and you stated your assistant had to leave to pick up her children from school, and the assistant arrived back … at 12:50 where then you [were] now within ratio." DSS's attorney also pointed out that, in contrast to the LPA's report, Khoshaba's own records for September 14, 2017, showed that her assistant left for the day at 12:36 pm, leaving Khoshaba out of ratio for over two hours (Khoshaba's records were inconsistent with the LPA's report). DSS's attorney then had the following exchange with Khoshaba:

"Q. I'm asking – you have your document, which is 24, Exhibit P, and you have my report, Exhibit 11. After looking at those two documents, are you willing to now admit that you were indeed overcapacity on September 14th –

"A. Yes –

"Q. – 2017?

"A. – and I – yes, ma'am. And I did fix it.

"Q. Right, but I'm not asking about whether you fixed it. Originally, you said you were not overcapacity, you've never been overcapacity. And now, I've just presented you with evidence –

"A. (Inaudible.)

22.

"Q. What?

"Q. Now, I'm never overcapacity.

"Q. Now you're never overcapacity.

"A. Never.

"Q. But back then, you might have been overcapacity?

"A. Oh, when the parents, they don't pick up their kids on time.

"Q. It's the parents' fault. Not yours. Okay. Now—

"A. – (inaudible). It's parents' job to pick up their kids from school.

"Q. And it's not your job to keep your license up to –

"A. (Inaudible) and call the parents to pick up their kids.

"Q. Well, you knew you had the hearing today. Why didn't you bring in any documents to show that you had asked the children's parents to come pick up the kids so you wouldn't be overcapacity? [¶] And I'm not sure how you make that be [*sic*] an excuse for being overcapacity. Instead you said you were not overcapacity…. [¶] … [¶]

"A. Repeat that again.

"Q. ….Were you overcapacity for those times that we listed in the accusation? August 6th, 2018, November 15th, 2017, September—

"A. Yes.

"Q. – 14th, 2017, November 10th, 2011, June 2nd, 2011.

"A. Yes. [¶] … [¶]

"Q. No other dates were you overcapacity?

"A. If there is, I don't remember. [¶] … [¶]

"Q. But you could have been overcapacity two years ago, you wouldn't remember.

"A. One time or two times, that's it. I'm not overcapacity.

"Q. Well, but what are you? Either you have been overcapacity and there are times you're overcapacity or you're not overcapacity. So I'm just trying to get from you a straight answer.

"A. I'm telling you straight answer. I'm not overcapacity anymore. I fixed it.

"Q. Since what date was the last time you believe you were ever overcapacity?

"A. (Inaudible) since the last time the licensing noticed me – notified me, I told all the parents.

"Q. So you've never been overcapacity since August 6th, 2018.

"A. You can stop by anytime.

"Q. No, I'm not going to stop by. I'm just trying to ask you questions so that you can answer them.

"A. Just to prove it to you guys. I love my job so much … I want to keep it because my joy is the kids. They're such a joyful – they're peace-people. They have beautiful soul. I mean, if it was you, you wouldn't be overcapacity around angels."

DSS's attorney then circled back to the allegation that Khoshaba was over capacity on August 6, 2018. A DSS LPA came to Khoshaba's daycare on October 27, 2018, to investigate the complaint made by Amanda B. regarding various violations at the daycare that day (that is August 6, 2018), including an overcapacity violation. As reflected in the LPA's report and pointed out by DSS's counsel, Khoshaba told the LPA: "I thought about [the overcapacity] issue. I realize now, that I was actually out of ratio, for approximately ten minutes on August 6, 2018. It was about 11:00 AM and a parent brought over a child and begged me to take her child, because she was called into work. I knew I shouldn't have done that, but I was only overcapacity for about ten minutes, before another parent arrived to pick up her child." (Ex. 19.) However, Khoshaba's roster/log in sheet for that day showed that 17 children were present at the daycare that day (the maximum capacity for the daycare was 14, with an assistant)". (Ex. U.)

When Khoshaba was shown her log in sheet for August 6, 2018, she stated: "Sometimes, we used to have a birthday, we used to invite everyone … and it could've been one of these days."[6] DSS's attorney responded: "So when you told the LPA that you were only overcapacity by one child for ten minutes, that was a lie, correct?" Khoshaba did not have a proper answer; rather she deflected the question with nonsensical responses. DSS's attorney pointed out that Khoshaba did not tell the LPA who investigated the issue that a birthday party was held that day. Khoshaba did not dispute the point. Nor did Khoshaba dispute that she told the LPA that she was only over capacity or out of ratio by one child for ten minutes on August 6, 2018.

DSS's attorney then had the following exchange with Khoshaba:

"Q. How many times were you overcapacity at your daycare?

"A. I don't remember.

"Q. Okay.

"A. Once or twice.

"Q. ….[B]ut you don't remember anything that happened on August 6th, 2018, except that there was a birthday party. Do you remember what time the birthday was?

"A. No.

"Q. And you don't remember who the birthday party was for.

"A. No.

"Q. And do you remember what time Ms. Kelly showed up at the daycare on August 6th, 2018?

"A. Well, usually, she shows up about 8:40 a.m., 8:45 a.m. It depends.

---

[6] However, Amanda B., who made the complaint at issue and testified at the hearing, did not mention in her testimony that a birthday party was underway when she went to the daycare for a job interview on August 6, 2018.

25.

"Q. Okay. So let's go back over –

"A. (inaudible) with me.

"Q. – Exhibit U, Page B33. If Ms. Kelly didn't show up until 8:30 a.m., 8:45 a.m., you had [12 children as reflected in the roster] all by yourself.

"A. "No, I told you sometimes, [Kelly] started at 5:00 a.m. with me. She has a house key, too. She just opens the door and walks in.

"Q. But you don't remember if this is the case on that day, do you?

"A. I don't remember. That was long time ago. [¶] … [¶]

"Q. ….But you had 17 kids there. Your capacity was 14. It would – if you would've had ten [assistants] there, it wouldn't have mattered. You were overcapacity.

"A. Again, the parents were with them, most of them, 90 percent. They were invited.

"Q. Ninety percent of the parents –

"A. Most of the time – most of the time, Ms. Kelly, she does start at 5:00 a.m. with me. She has a key. She walks in.

"Q. And so if Ms. Kelly showed up at 5:00 a.m., she would stay there until six o'clock in the evening so that you would always be overcapacity? [*Sic.*] Is that what you're saying?

"A. Yeah. (Inaudible) when –

"Q. (Inaudible) --

"A. Yes. Because if she wanted to take an hour lunch, she would go upstairs and take an hour lunch. She laid down, and then after that, she comes down. She upstairs if I need her.

"Q. And so you consider that if she was upstairs taking a nap that she was still your assistant at the daycare?

"A. In case [of] emergency, yes. [¶] … [¶]

"Q. Right. But still, when Ms. Kelly went upstairs to go take her nap, you still had 17 children in your daycare that you were taking care of.

26.

"A. Not 17. I told you that was one day. (Inaudible.)

"Q. One, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seven[teen] children at least until 2:30 p.m. in the afternoon. It was a long party?

"A. (Inaudible), some parents, when they see their kids having fun, they don't want to take their kids[.]"

DSS's attorney reminded Khoshaba that Khoshaba had previously told DSS's LPA, with regard to operating over capacity on August 6, 2018, that she was "only overcapacity for about ten minutes" because "a parent brought over a child and begged [Khoshaba] to take her child because she was called into work." DSS's attorney stated: "Now you don't remember having the conversation [with the LPA] but now, you remember you had a birthday party that day." Khoshaba responded: "[The extra child] wasn't scheduled for that day. [The mother] was explaining herself. Oh, you have a birthday party. Good, good, good."

DSS's attorney said, "But you never mentioned it to the [LPA], the birthday party." Khoshaba answered: "I did not have to mention every birthday party we have." Khoshaba added: "And when the mom came in to drop in the kid, [she said] I'm so sorry. They weren't scheduled for today, and I'm so sorry. I don't have a gift for the birthday party because I wasn't scheduled to come in today. They just called me." DSS's attorney came back: "So you remember having the conversation on August 6th with the mother that caused you to be overcapacity by one child for ten minutes." Khoshaba replied she remembered the conversation with the mother, but not the conversation with the LPA. Khoshaba continued: "I don't have to call Licensing for every birthday."

At the end of Khoshaba's cross-examination, DSS's counsel had the following exchange with her:

"Q. You admit to [the overcapacity] violations [in the accusation], correct?

"A. Yes, and I fixed it.

27.

"Q. Okay. And exactly when did you fix it? [¶] … [¶]

"A. I don't remember. I just fixed it. I don't accept overcapacity. I have waiting list. I have them all on my phone. The waiting list parents have to wait."

On redirect, Khoshaba testified that since the last incident at issue in the accusation, she had installed a camera inside her home.

### *Testimony of Kelly Buttram*

Kelly Buttram, Khoshaba's assistant, testified on Khoshaba's behalf. Buttram had worked with Khoshaba since 2012, "almost 11 years." Asked about her experience working for Khoshaba, Buttram stated: "No complaints. I like working with her."

With respect to the hours she worked at the daycare in 2017, Buttram said: "2017. I don't think we have set hours, but it was always 9:00 a.m. to when were were supposed to be at capacity, like … when she's allowed to be by herself." As for her hours in 2018, Buttram stated: "It's been the same schedule. Nothing has really changed. I just never leave. I stay there until she's at the right amount – I believe it's six to eight kids she's allowed to be alone with." However, Buttram modified her testimony when asked whether she had told an LPA who inspected the daycare that her hours were approximately 9:00 a.m. to 2:30 p.m. Buttram stated: "Nine a.m. to 3:00 p.m. is what I will tell people, but … I don't always leave at 3:00 p.m." Buttram subsequently reiterated she told the LPA her schedule was "Nine a.m. to 3:00 p.m." Buttram added: "I try to be there at 8:45 a.m. But I'm always there before 9:00 a.m."

Buttram said Khoshaba could be alone only with six or eight children. However, Buttram acknowledged that she had to leave the daycare at times to pick up her own children from school. Buttram said this happened only "once or twice." DSS's counsel cross-examined Buttram on her claim with reference to reports by LPAs who had found Buttram absent from the daycare and Khoshaba over capacity (in the absence of an assistant). First, DSS's counsel addressed an LPA's visit to the daycare on November 15, 2017. Counsel noted that the LPA arrived at the facility at 2:45 p.m. that day and found

28.

"there were ten children present with no assistant." Counsel added that Khoshaba told the LPA that Buttram had left at 2:30 p.m. to attend to her son at his school. The LPA's report indicated that Buttram returned to the facility at 3:00 p.m. Buttram conceded this was one of the two times she had left Khoshaba alone with the kids.

DSS's counsel then addressed a second LPA visit to the facility, one that took place on September 14, 2017. Counsel stated that the LPA's report indicated that Khoshaba was alone at the time and was monitoring 12 children. Counsel stated the LPA's report indicated that 40 minutes after the LPA's arrival at the daycare, Buttram returned to the facility. Buttram conceded this was the second time she had left the facility to attend to her own children when her presence was required for the daycare to remain within capacity limits. DSS's counsel then asked Buttram: "So the only times you ever [left Khoshaba alone and over capacity] just happened to coincide with the times that the Department of Social Services went out to Ms. Khoshaba's facility?" Buttram responded: "Big old coincidence."

With regard to overcapacity issues, Buttram stated that since 2018, Khoshaba had "contacted parents, posted information on the door, and [arranged for Buttram to] stay longer." Buttram was asked: "And then, to your knowledge, has the daycare operated overcapacity or out of ratio at any point since 2018?" Buttram responded: "No, it hasn't."

Buttram, however, acknowledged that she would go upstairs and nap for one hour during the day and that this would happen "[a] lot." During this period, which was Buttram's break, Khoshaba remained downstairs (where the daycare was situated) and watched all the children (Buttram acknowledged Khoshaba would monitor more than eight children during these breaks).

In addition, Buttram was asked about the fact that a sign-in log for August 6, 2018, submitted by Khoshaba to the ALJ, showed that 17 kids were present at the daycare that day. Buttram responded: "I don't see how there could've been 17 kids there all at one

29.

time." Buttram was then asked: "So on August 6th, 2018, are you saying that the log that Ms. Khoshaba provided to this court is incorrect in indicating that there were 17 kids there at the same time?" Buttram answered: "I don't know."

As for the personal rights violation allegations in the accusation, Buttram testified: "I've never seen Ms. Khoshaba put her hands on any child in any negative way, and we don't leave children in highchairs." Buttram was asked about the incident on May 17, 2022, when Khoshaba allegedly slapped Child 1 and pushed him to the ground. Buttram responded: "[Child 1] was with me sitting at the table. We were doing some classwork, and he went poop in his diaper, and I walked him out to Nina, and I gave her a diaper and wipies, and I told her it was her turn to change his diaper because I couldn't get to it. It was – poop is not my thing. And I walked back into the classroom, and a few – not even a minute later, I heard [Child 1's] mom scream, and I went in there, and it was just a bunch of her grabbing him and yelling and walking out of the house." Buttram confirmed, however, that someone coming in the front door would have been able to look directly into the living room, where Khoshaba and Child 1 were standing. Buttram was also asked about the other personal rights violations alleged against Khoshaba in the accusation. Buttram expressed doubts that they had occurred.

With regard to the improper supervision allegation (concerning Child 7 on July 19, 2017) in the accusation, Buttram stated she did not see the incident and "never heard about [Child 7] falling and hitting his head." Buttram subsequently heard about the incident from an LPA who came to the facility and interviewed Buttram. Buttram indicated the bathroom where the incident is said to have occurred is very small and two children would generally not be using it at the same time.

### Other Testimony

Several parents who had children in Khoshaba's daycare testified on her behalf. The parents were Eris Brown, Darlene Tyler, Jennifer Gaspar, Ivan Garcia Juarez, Marissa Wyatt, Angelica Flores, Chandray Whitten, and Alyssa Figueroa. These parents

30.

uniformly were very happy with the care provided by Khoshaba and lauded her services without reservation. Finally, a 14-year-old student, J.C., testified in support of Khoshaba (J.C.'s mother was one of the parents who testified in support of Khoshaba). J.C. attended Khoshaba's daycare from 2009 until 2019. J.C. did not remember anything from his early years at the daycare as he was very young at the time. Thereafter, upon starting kindergarten in 2013, J.C. was at the daycare after school hours or in the summer. By 2017, he was no longer attending the daycare regularly. J.C. was asked about his experience at the daycare. J.C. testified: "No complaints. It's always been good, and I've always [liked] going there."

### The Administrative Law Judge's Decision

As noted, the administrative hearing in this matter was held on June 21 and 22, 2023. The ALJ, Karen Reichmann, issued her decision on July 20, 2023. The ALJ's decision included evidentiary findings, ultimate findings, legal conclusions, and a final order. The ALJ noted: "Pursuant to Health and Safety Code section 1596.887, subdivision (b), 1596.889, and 1596.8897, subdivision (e), the standard of proof in this proceeding is the preponderance of the evidence [standard]."

### ALJ's Evidentiary Findings

The ALJ first summarized the evidence presented by DSS as well as the evidence presented by Khoshaba. In particular, the ALJ made detailed evidentiary findings as to Khoshaba's testimony, as follows (in relevant part):

> "17. Respondent made many statements during her testimony about the allegations that were inconsistent, implausible, demonstrably false, evasive, or exaggerated. For this reason, her testimony was not credible.

> "18. Respondent denied all of the personal rights violation allegations, and specifically denied ever hitting, slapping, grabbing, or yelling at any children in her care.

> "Regarding Child 1, respondent testified that she was kneeling on the floor and trying to place him on a mat in order to change his diaper

31.

when he saw his mother arrive and started squirming, causing her to fall on the floor with him in her arms. She denied slapping him or being physically aggressive. Respondent believes the mother might have falsely accused her in order not to pay what she was owed.

"Respondent denied pinching Child 2 and stated that the child's mother was friends with Child 3's mother and that both children's mothers lied and coached the children to lie. She speculated that Child 2's mother was unhappy with respondent because the child had wet herself in the car seat on the way home from the facility.

"Respondent denied grabbing or pinching Child 4, and opined that his mother and his brother, Child 5, both lied. She speculated this was because the mother owed respondent money and 'something was going on in her life.' Respondent added that the mother was rough with her own kids.

"Respondent denied ever leaving a child alone in a high chair and denied being cited for doing so. She called the allegation that she left a child alone in a high chair in front of a television in March 2014 'a lie' by the reporting LPA. She denied ever having children in high chairs other than during mealtimes.

"Respondent did not remember Amanda [B.] and denied grabbing children or shoving food into their mouths.

"Respondent noted that she has installed a camera in the living room of her facility to document any further incidents to protect her against future allegations.

"19.    Respondent denied any fault in relation to the incident of July 19, 2017, in which Child 7 hit his head in the bathroom, refusing to agree that this incident reflected a failure to adequately supervise the child, even though she acknowledged that her back was towards him while she attended to another child when it happened. She minimized the incident and insisted that the child 'was okay.'

"20.    Respondent's testimony regarding overcapacity and out of ratio violations was inconsistent and defensive. At times, she outright denied ever being overcapacity. At other times she admitted being overcapacity, but only on the occasions when she was cited. At one point, she stated, 'you want overcapacity around angels' (suggesting that she enjoys having many children around) and that in her mind, she could safely take care of 'hundreds' of children. When asked about the citation for being

32.

overcapacity on August 6, 2018, and shown her roster reflecting that 17 children were present, respondent testified that there was a birthday party that day, and that '90 percent of parents were there the whole time.' Her testimony regarding the birthday party was continuously embellished and appeared to have been fabricated. Respondent never told the LPA investigating the overcapacity allegation that there had been a birthday party that day.

"21. Respondent testified that she was overcapacity when her assistant had to leave and pick up her children 'only one time.' This testimony was not credible.

"22. Respondent stated that she told parents after the 2011 overcapacity citation that she would charge them extra if they are not on time picking up the children, but also that she has never implemented this policy because she knows the parents would refuse to pay. She also testified that she has threatened to kick them out if they are not on time.

"23. When denying the out of ratio/overcapacity violations, respondent testified that her assistant sometimes comes as early as 5:00 a.m. This testimony was refuted by the testimony of the assistant, who stated she arrives around 8:45 a.m.

"24. Respondent insisted that she not been overcapacity since 2017, when she implemented a roster with numbers to make sure she keeps track of how many children are present. She repeatedly blamed parents for not picking up children on time and expressed her view that she had no choice but to care for as many children as were brought to her.

"25. Respondent denied making statements attributed to her by the LPAs in their reports.

"26. Respondent made disparaging statements about the parents who have submitted complaints or said anything negative about her."

## ALJ's Ultimate Findings

The ALJ thereafter made "ultimate findings" as to the allegations in the accusations regarding personal rights violations, inadequate supervision, and staffing ratio and/or capacity violations. (Some capitalization omitted.)

*Personal Rights Violations*

With regard to allegations of personal rights violations, the ALJ made the following ultimate findings:

> "30.    A preponderance of the evidence established that respondent violated Child 1's personal rights on May 17, 2022, by slapping and being physically aggressive with him, based on Child 1's mother's credible testimony and corroborating evidence.  [Citation.]

> "31.    A preponderance of the evidence established that respondent violated the personal rights of Child 2 and Child 3 on October 25, 2018, when she hit Child 2 on the lip in the presence of Child 3.  [Citation.]

> "32.    A preponderance of the evidence established that respondent violated the personal rights of children in her care on August 6, 2018, when she was physically aggressive with the children during the job interview of Amanda [B.].  [Citation.]

> "33.    A preponderance of the evidence established that respondent violated the personal rights of Child 4 and Child 5 on [August 24,] 2017, when she grabbed or hit Child 4 on the lip, in the presence of Child 5.  [Citation.]

> "34.    A preponderance of the evidence established that respondent violated the personal rights of Child 6 on March 18, 2014, when she left the child strapped in a high chair, unsupervised.  [Citation.]

> "35.    It was not established by a preponderance of the evidence that respondent violated the personal rights of children in her care on September 27, 2012, either by yelling at them or leaving them in high chairs for an extended period of time."

*Inadequate Supervision*

With regard to the allegation of inadequate supervision, the ALJ made the following ultimate finding:

> "36.  A preponderance of the evidence established that respondent failed to adequately supervise Child 7 on July 19, 2017, when he struck his head in the bathroom, either because respondent left the child unattended (as she initially told the child's parent) or because she had her back turned to him while he was on the toilet.  [Citation.]."

*Staffing Ratio and/or Capacity Violations*

With regard to allegations regarding operating out of ratio and/or over capacity, the ALJ made the following ultimate finding:

> "37.   A preponderance of the evidence established that respondent's facility was overcapacity and/or out of ratio during the five unannounced visits [encompassed in the accusation].  The evidence strongly suggested that respondent operated overcapacity and/or out of ratio on other occasions."

*Conduct Inimical*

The ALJ made an additional ultimate finding as follows:

> "38.   By violating the personal rights of children in her care, failing to provide adequate supervision, and disregarding ratio and capacity limits, respondent engaged in conduct inimical to the health, morals, welfare, or safety of individuals receiving services from the facility."

**ALJ's Legal Conclusions**

The ALJ noted that under Health and Safety Code sections 1596.885 and 1596.8897, and related regulations, DSS "may suspend or revoke the family child care license of a licensee" "who violates the personal rights of a child client," or "based on lack of care or supervision of a child in care," or "who violates the ratio requirements regarding the number and ages of children present," or "who engages in conduct that is inimical to the health, morals, welfare, or safety of individuals receiving services from the facility."  (CCR §§ 102423, 102417, 102416.5, 102402.)  The ALJ noted that, in light of her factual findings, all these "[c]ause[s] for license discipline [were] established."

The ALJ further observed that pursuant to Health and Safety Code sections 1596.885 and 1596.8897 and Welfare and Institutions Code section 16519.6, subdivision (g)(1), DSS "may … prohibit an individual's employment in, presence in, and contact with clients of any facility licensed by the Department … if the individual has violated the Department's regulations or has engaged in conduct inimical to the health, morals, welfare or safety of individuals receiving services from the facility or to

35.

the people of this state." The ALJ continued: "Respondent both violated the Department's regulations and engaged in conduct inimical to the health, welfare, and safety of the children in her care." The ALJ noted that, in light of her factual findings and legal conclusions, "[c]ause exists to exclude respondent from licensed facilities."

The ALJ concluded: "The evidence established that respondent has been operating her facility for many years and has been greatly appreciated by many parents in the community for providing excellent and enriching care to their children. The evidence also established that respondent has violated the personal rights of children in her care, most recently in May 2022, when she was physically aggressive with Child 1; that she failed to adequately supervise a child in her care; and that she had a history of capacity and/or ratio violations. Respondent did not testify credibly and demonstrated a disregard for the Department's licensing regulations. On this record, revocation of her license is warranted and in the public interest, notwithstanding the sincere outpouring of support by satisfied parents. Because respondent cannot be trusted to respect the personal rights of children in her care and cannot be trusted to be honest with the Department, an exclusion order is also warranted."

**ALJ's Order**

The ALJ ordered that Khoshaba's "license to operate a family child care home is revoked." The ALJ further ordered that Khoshaba "is prohibited from employment in, presence in, and from contact with clients of, any facility licensed by the Department … until she successfully petitions for reinstatement."

DSS adopted the ALJ's proposed decision. Khoshaba then filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5 and requested a stay of DSS's order.

**D.    Superior Court's Ruling on Khoshaba's Petition for Writ of Mandate**

The superior court considered Khoshaba's petition for writ of mandate. The court summed up Khoshaba's contentions: "[Khoshaba] argues that she was denied a fair and

36.

impartial hearing because her testimony was misrepresented, the ALJ disregarded some witness testimony, the ALJ admitted child hearsay statements, and the ALJ made incorrect witness credibility determinations. [Khoshaba] argues that the parents had motives, inclusive of financial motives, to lie. [Khoshaba] suggests that [Amanda B.] had an ax to grind. [¶] [Khoshaba] also argues that the installation of interior cameras abate[s] any potential risk to children." The court denied Khoshaba's petition for writ of mandate and request for a stay.

The court noted in its ruling: "The operation of a daycare is a fundamental vested right and is reviewed under the 'independent judgment' standard." The court further observed: "The cases on this are not entirely clear, but the Court believes it should defer to reasonable factual findings, but not to unreasonable factual findings. Credibility findings, as here, are best left to the hearing court in most cases, but in [this] case the Court specifically finds [Khoshaba] was not credible in her combative, shifting testimony. The Court notes here that the procedural handling of objections and interruptions at hearing was looser than normal, leading to a somewhat chaotic record; nonetheless, [Khoshaba] was part of that problem."

Upon reviewing the ALJ's decision under the independent judgment standard of review, the court first addressed Khoshaba's contentions as to the ALJ's adverse credibility findings regarding Khoshaba's testimony. The court stated: "This Court has reviewed the transcript of [Khoshaba's] testimony in [the] ALJ hearing and endorses the following statement by ALJ Reichmann: '[Khoshaba] made many statements during [her] testimony about the allegations that were inconsistent, implausible, demonstrably false, evasive or exaggerated.' This Court lacks the advantage of seeing the testimony in person, but examples abound of inconstant testimony that reforms prior statements. For instance, [Khoshaba] testified that her assistant normally shows up at '8:40, 8:45 a.m.' Within the span of one page, she testifies that her assistant 'usually arrives at 5 a.m.' This is simply not an isolated incidence. ALJ Reichmann was well within her rights to

disbelieve [Khoshaba's] entire testimony and conclude that she had a disregard for the requirements of the agency."

The court continued: "[Khoshaba] argues that the ALJ found [her] not credible 'solely based on her testimony regarding the 2017-2018 overcapacity incidents.' To be sure, ALJ Reichmann found her not credible regarding those incidents. But she noted an ongoing pattern of a lack of forthrightness, which this Court views as well-reasoned." The court concluded: "[T]he Court specifically finds [Khoshaba] was not credible in her combative, shifting testimony."

Next the court addressed Khoshaba's claim that the ALJ was biased. The court stated: "[Khoshaba] further argues that ALJ Reichmann must have been unconsciously biased against her since she spoke with a thick accent. This Court rejects that argument summarily. The words on the pages of the transcript, which have no accent, show the pattern that ALJ Reichmann observed."

With regard to Khoshaba's contention that the installation of a camera in her living room had alleviated any future concerns, the court noted: "[Khoshaba's] claim that she is able to avoid further problems by installation of cameras is viewed by [DSS] as too little, too late. Part of this problem is that [Khoshaba] is not an accurate historian. Under [Khoshaba's] theory, any problems can be offset by maintaining cameras; this does not appear to be supported by legal authority and would result in no discipline being able to be imposed under almost any circumstances."

As to Khoshaba's claim that DSS's documentation was unreliable, the court rejected that claim. The court stated:

> "[Khoshaba] argues that [DSS's documents] referred to things that occurred in 2017-2019 as 'COVID-related.' This is correct and mystifying – for example, a document signed and dated in 2019 in [the] administrative record [at] p. 361 is listed as 'COVID-related.' This makes it quite clear that the document has either been altered since it was signed, or the dates on them are incorrect. [DSS] says there is no evidence as to when the notation was made, but there is no reason to permit alterations of already-

signed documents. Under [DSS's] theory, the alterations were made post-signature. The Department of Social Services' document management practices do not appear to conform to best policy, and the Department is on notice that their documents can be altered after signatures are affixed.

"In this case, the Court is satisfied that this sloppiness probably does not infect the entire integrity of the documents provided; further, there is sufficient direct evidence to show multiple incidences of personal rights violations and overcapacity violations. But it ought not be a surprise to the agency that [Khoshaba's] complaints are well-grounded and introduce a degree of doubt. The Court assumes that ALJ Reichmann considered this argument and evidence and defers to her overall ruling, but in a different case the Court might very well view it differently. The Court further agrees with [Khoshaba] that [DSS's] apparent interest in this issue is lower than warranted by the facts."

The court next addressed Khoshaba's complaint that the ALJ had upheld allegations that previously, at the level of agency review, were found to be unsubstantiated. The court stated: "[Khoshaba] argues that making findings on previously unsubstantiated allegations is disallowed. [Khoshaba] asserts that this is governed by *Saraswati v. San Diego* (2011) 202 Cal.App.4th 917, but this isn't so. In *Saraswati*, the governing code governing child abuse required a finding of 'unfounded,' which means false, 'inconclusive,' which means what it says, or 'substantiated,' which means true. [Khoshaba] argues that 'unsubstantiated,' means insufficient evidence (which is correct) and it means the same thing as 'unfounded,' which it does not. The Court is therefore not persuaded that this was unlawful." (Italics added.)

The trial court concluded: "The linchpin of [Khoshaba's] argument is that the hearing judge misread the evidence to a substantial degree, possibly due to bias. [Khoshaba's] testimony that there were conspiracies against her and that the ALJ and agency acted with actual or implicit bias is unsupported by the record. The conclusion that [Khoshaba] was not an accurate historian is well-supported by the record. As such, the Petition for Writ of Mandate is DENIED. [¶] As [Khoshaba's] petition is denied, the request for stay is also DENIED."

## DISCUSSION

### I.       The Trial Court's Ruling Was Not Erroneous

#### A.       *Standard of Review*

While the trial court was required to independently review the evidence (see below), the standard of review on appeal from the trial court's determination is the substantial evidence test.  (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824.)  That is, we must "sustain the trial court's findings if they are supported by substantial evidence." (*Governing Board v. Haar* (1994) 28 Cal.App.4th 369, 378; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 ["After the trial court has exercised its independent judgment upon the weight of the evidence, an appellate court need only review the record to determine whether the trial court's findings are supported by substantial evidence."].) Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate support for a conclusion" (*Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340-1341), or evidence of " ' "ponderable legal significance … reasonable in nature, credible, and of solid value." ' "  (*Ofsevit v. Trustees of Cal. State University & Colleges* (1978) 21 Cal.3d 763, 773, fn. 9.)

To reiterate, "on appeal from a judgment denying a petition for writ of administrative mandate, the focus is on the *trial court's* findings and whether there is substantial evidence to support those findings [citations], … and the trial court's judgment is presumed correct[.]"  (*Shenouda v. Veterinary Medical Board* (2018) 27 Cal.App.5th 500, 513-514 (*Shenouda*).)  "As in all appeals, the appellant has the burden to show, through analysis and citation to the record, that no substantial evidence supports the court's findings."  (*Id*. at p. 514; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [the appellate court " 'starts with the presumption that the record contains evidence to sustain every finding of fact' "].)  The appellant not only has the burden to show error, but also that the error was prejudicial.  (See *Shenouda,* at p. 512 ["the appellant bears the burden to affirmatively demonstrate error, and must show that

the error was prejudicial"]; *In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 575 [" 'The *burden is on the appellant*, not alone to show error, but to show *injury* from the error.' "].)

We review questions of law de novo. (*Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 107-108; *Christensen v. Lightbourne* (2017) 15 Cal.App.5th 1239, 1251 (*Christensen*) [on questions of law arising in mandate proceedings, courts exercise independent judgment, with the superior court and appellate court performing the same functions]; *Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 99 ["An appellate court independently determines whether the agency [or entity] prejudicially abused its discretion by failing to proceed in the manner required by law, such as by failing to comply with required procedures, applying an incorrect legal standard, or committing some other error of law."].) In other words, we apply our independent review without deference to the lower court's rulings. (*Christensen*, *supra*, at p. 1251; *Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 433-434 (*Alberda*) [in an administrative mandamus action, "when the appellate issue is a pure question of law," such as whether the trial court applied the correct standard of review, we review the issue de novo]; *Melkonians v. Los Angeles County Civil Service Com.* (2009) 174 Cal.App.4th 1159, 1168.)

### B. The Superior Court Applied Correct Standard of Review in Denying Khoshaba's Writ

Khoshaba first argues the trial court applied an incorrect standard of review. As explained below, we disagree.

" 'Code of Civil Procedure section 1094.5 is the administrative mandamus provision providing the procedure for judicial review of adjudicatory decisions rendered' " in an administrative proceeding. (*Paxton v. Board of Administration, Public Employees' Retirement System* (2019) 35 Cal.App.5th 553, 559; *Poncio v. Department of*

41.

*Resources Recycling & Recovery* (2019) 34 Cal.App.5th 663, 668-669 (*Poncio*)
[" 'Section 1094.5 of the Code of Civil Procedure provides the basic framework by which an aggrieved party to an administrative proceeding may seek judicial review of any final order or decision rendered by a state or local agency.' "].)

When the trial court reviews an administrative decision pursuant to a petition for a writ of mandate under Code of Civil Procedure section 1094.5 (section 1094.5), it reviews the decision for abuse of discretion. (§ 1094.5.) "Abuse of discretion is established if … the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).) A trial court uses two alternative standards of review in reviewing an administrative decision in an administrative mandamus proceeding. The two alternative standards of review are the "independent judgment" standard of review and the "substantial evidence" standard of review. (*Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1280 (*Benetatos*).)

We first address the "independent judgment" standard of review. " 'If the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence … [and] must examine the administrative record for errors of law and exercise its independent judgment upon the evidence.' " (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1280; *Alberda*, *supra*, 214 Cal.App.4th at p. 433 [the trial court exercises its independent judgment upon the evidence when it reviews an administrative decision that substantially impacts a fundamental vested right].) "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (§ 1094.5, subd. (c).)

In carrying out its independent review, "the trial court must afford the [administrative] decision a strong presumption of correctness and must impose upon the petitioner the burden of showing that the [administrative] findings are contrary to the

weight of the evidence, i.e., the decision was not supported by the preponderance of the evidence." (*Alberda*, *supra*, 214 Cal.App.4th at p. 433.) " 'Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the [administrative] findings.' [Citations.] Thus, while the trial court begins its review with a presumption of the correctness of the administrative findings, the presumption is rebuttable and may be overcome by the evidence. [Citation.] 'When applying the independent judgment test, the trial court may reweigh the evidence and substitute its own findings for those of the [administrative adjudicator], after first giving due respect to the [adjudicator's] findings.' [Citation.] This includes examining the credibility of witnesses." (*Alberda*, *supra*, 214 Cal.App.4th at p. 433; see *Levingston v. Retirement Board* (1995) 38 Cal.App.4th 996, 1000 [trial court independently reviews the administrative record and may reweigh the evidence].) As mentioned, "abuse of discretion is established if the court determines that the [administrative] findings are not supported by the weight of the evidence." (§ 1094.5, subd. (c); *Alberda*, *supra*, 214 Cal.App.4th at p. 433.)

As for the substantial evidence standard of review, it applies " '[w]here no fundamental vested right is involved.' " (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1280.) Under the substantial evidence standard of review, " 'the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record.' " (*Ibid.*; see § 1094.5, subd. (c).) "The reviewing trial court considers all relevant evidence, including that which detracts from the decision. A court may reverse an [administrative] decision only if, based on the evidence before the [adjudicator], a reasonable person could not reach the [adjudicator's] conclusion. [Citation.] In making this determination the court presumes substantial evidence supports the [administrative] decision [citation] and resolves reasonable doubts in favor of the findings and decision[.]" (*Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 360; see

*Poncio*, *supra*, 34 Cal.App.5th 663, 668-669; *JMS Air Conditioning & Appliance Service, Inc. v. Santa Monica Community College Dist.* (2018) 30 Cal.App.5th 945, 967-968.)

Here, the parties agree the trial court was required to apply the independent judgment standard of review because revocation of a business license substantially affects a fundamental vested right and triggers such review. (See *Lam v. Bureau of Security & Investigative Services* (1995) 34 Cal.App.4th 29, 35.)

In a very brief argument, however, Khoshaba argues: "In its ruling, the trial court failed to apply the proper legal standard." More specifically, Khoshaba contends: "While the trial court correctly stated that the standard is 'independent review' given the fundamental rights at stake, it proceeded to substantively apply what amounts to a deferential 'substantial evidence' standard. [Citation.] After stating that the 'cases on this are not entirely clear,' the trial court stated it 'believes [that] it should defer to reasonable factual findings, but not unreasonable factual findings.' "

DSS responds: "Here, the trial court properly applied the correct standard. The trial court's order shows thorough consideration of the ALJ's findings and demonstrates that the trial court critically reviewed the record before arriving at its own conclusions." Among other things, DSS notes that the court "made specific findings of its own regarding Khoshaba's credibility"; "criticized the administrative tribunal's handling of the matter at hearing";[7] "directly considered Khoshaba's remediation plan involving security cam[e]ras"; and "critiqued the Department's document-retention policies." DSS concludes: "In brief, the trial court's decision clearly sets forth that it independently reviewed the administrative record and made its own findings based on the weight of the

---

**7** DSS appears to be referring to the following statement in the trial court's ruling: "The court notes here that the procedural handling of objections and interruptions at hearing was looser than normal, leading to a somewhat chaotic record; nonetheless [Khoshaba] was part of that problem."

evidence, while giving the appropriate presumption of correctness to the administrative findings."

We are not persuaded by Khoshaba's contention that "the trial court failed to apply the proper legal standard." The trial court independently evaluated Khoshaba's claims, and in doing so, it independently considered and weighed the evidence and made its own credibility and factual findings, after giving "due respect" to the ALJ's determinations. (*Alberda*, *supra*, 214 Cal.App.4th at p. 433.) For example, the court carefully parsed the hearing transcript, assessed Khoshaba's testimony in detail, and reached its own conclusion that Khoshaba "was not credible in her combative, shifting testimony." Similarly, in evaluating Khoshaba's claim that the ALJ was biased, the court stated: "[Khoshaba] further argues that [the ALJ] must have been unconsciously biased against her since she spoke with a thick accent. This Court rejects that argument summarily. The words on the pages of the transcript, which have no accent, show the pattern that [the ALJ] observed." In addition, the court independently reviewed legal issues. For instance, the court noted: "[Khoshaba's claim that she is able to avoid further problems by installation of cameras is viewed by [DSS] as too little, too late. Part of this problem is that [Khoshaba] is not an accurate historian. Under [Khoshaba's] theory, any problems can be offset by maintaining cameras; this does not appear to be supported by legal authority and would result in no discipline being able to be imposed under almost any circumstances."

Also unavailing is Khoshaba's reliance on the trial court's statement that it would "defer to reasonable factual findings, but not unreasonable factual findings." Khoshaba's contention that this statement indicates the trial court applied the substantial evidence standard of review is unpersuasive. Rather, the court's statement indicates it considered whether, in its *own*, *personal* judgment, the ALJ's findings were reasonable in light of the weight of the evidence, and in doing so, it weighed the evidence for itself. While the trial court used in this instance and a couple of others, language suggesting potential deference

45.

to the ALJ's findings, it reasonably appears the trial court was referring to the possibility of potential adoption of the ALJ's findings *upon exercising its independent judgment on the evidence*. (See *Rodriguez v. City of Santa Cruz* (2014) 227 Cal.App.4th 1443, 1453 & fn. 2 (*Rodriguez*) [although "the trial court was required to afford a strong presumption of correctness to the ALJ's findings," in the final analysis "the notion of deference has no place in the independent judgment standard"].)

Similarly, as to credibility, the trial court correctly acknowledged that the administrative tribunal is best situated to assess witness credibility because it has "the advantage of seeing the testimony in person." (See *Rodriguez*, 227 Cal.App.4th at p. 1453, fn. 2 ["Government Code section 11425.50, subdivision (b) … requires trial courts to accord 'great weight' to an agency's credibility determination 'to the extent the determination identifies the observed demeanor, manner, or attitude supporting [its] conclusion' "]; *California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 588 ["[Gov. Code, § 11425.50] requires deference … to the extent the ALJ identifies observed demeanor, manner, or attitude of the witnesses"].) Here, the ALJ made detailed findings about Khoshaba's testimony, noting she was not credible in light of her "inconsistent, implausible, demonstrably false, evasive, or exaggerated statements." However, as the ALJ only obliquely referred to Khoshaba's manner or attitude, the trial court made its own credibility findings as required. As to Khoshaba's testimony, the trial court concluded: "[T]he Court specifically finds [Khoshaba] was not credible in her combative, shifting testimony." (See *Alberda*, *supra*, 214 Cal.App.4th at p. 433 [" '[A]n exercise of independent judgment *does* permit (indeed, it requires) the trial court to reweigh the [administrative hearing] evidence *by examining* the credibility of witnesses.' "], second italics added.)

"The bottom-line question for the trial court here was whether [Khoshaba] showed that [her] evidence outweighed [DSS's] evidence." (*Alberda*, *supra*, 214 Cal.App.4th at p. 435.) "This means the trial court had to consider all the evidence and decide whether

[Khoshaba's] presentation in the trial court sustained [her] burden of showing that the weight of the evidence [i.e., the preponderance of the evidence] presented by both sides in the administrative hearing was contrary to the [administrative] finding[s]." (*Id.* at p. 434.) The trial court's ruling clearly shows that it carefully considered the record and answered this question in the affirmative for itself. We conclude the trial court properly applied the independent judgment standard of review.

In sum, under the independent judgment standard of review, the trial court "begins its review with a presumption of the correctness of the administrative findings[.]" (*Alberda*, *supra*, 214 Cal.App.4th at p. 433.) "[A]lthough the trial court begins its review with a presumption that the administrative findings are correct, it does *not* defer to the fact-finder below and accept its findings whenever substantial evidence supports them. Instead, it must weigh all the evidence for itself and make its *own* decision about which party's position is supported by a preponderance." (*Id.* at p. 435.) "The question is not whether *any* rational fact-finder could make the finding below, but whether the reviewing court believed the finding actually is correct." (*Ibid.*, italics added.) Considering the trial court's ruling as a whole, we are satisfied the trial court reached its conclusions upon following the requisite analytical process.[8]

Finally, even had the trial court erred in its standard of review, remand for the court to review the matter again is not always required. If independent judgment review is applicable, ordinarily "[r]eversal would be mandated when the record showed that the trial court did not examine and weigh the losing party's evidence or exercise its independent judgment as to the credibility of witnesses and the overall weight of the evidence." (*Malibu Mountains Recreation, Inc. v. County of Los Angeles* (1998) 67 Cal.App.4th 359, 370 (*Malibu Mountains*).) However, "[a] judgment will only be

---

[8] It bears mention that Khoshaba did not obtain a statement of decision and therefore the trial court's ruling is in the more limited form of a minute order.

reversed if the error at the trial court level resulted in a miscarriage of justice to the extent that a different result would have been probable without the error. (Cal. Const., art. VI, § 13)." (*Malibu Mountains* at p. 372.) Here, even positing error with respect to the standard of review, "[t]he court's analysis of the entire record on the basic issues that determine the outcome of this case leads to the unequivocal conclusion that no different result would ensue if this matter were to be remanded for [additional] review" under the appropriate standard of review. (*Ibid.*) Thus, remand is unwarranted.

### C.     *Khoshaba's Contention That the ALJ Retroactively Substantiated Formerly Unsubstantiated Allegations Has No Merit*

Khoshaba next argues that, at the administrative hearing, DSS improperly relied on "multiple previous allegations which its own investigators found to be 'unsubstantiated,' lacking sufficient evidence to sustain a finding when they occurred." Khoshaba adds: "Evidence is not a fine wine that ripens into substantiation after five years of fermentation; either the evidence is sufficient or it is not."

DSS responds: "[T]he ALJ did not err in considering the evidence of complaints that were previously determined to be 'unsubstantiated'—i.e., inconclusive." DSS notes: "[I]n assessing the previously unsubstantiated complaints, the ALJ had additional evidence before her that was not considered when the complaints were previously determined to be unsubstantiated, including new witness testimony at the hearings, further evidence of Khoshaba's lack of credibility, and evidence of other similar, substantiated incidents."

As to this issue, the trial court ruled: "[Khoshaba] argues that making findings on previously unsubstantiated allegations is disallowed. [Khoshaba] asserts that this [issue] is governed by *Saraswati v. San Diego* (2011) 202 Cal.App.4th 917, but this isn't so. In *Saraswati*, the … code governing child abuse required a finding of 'unfounded,' which means false, 'inconclusive,' which means what it says, or 'substantiated,' which means true. [Khoshaba] argues that 'unsubstantiated,' means insufficient evidence (which is

correct) and it means the same thing as 'unfounded,' which it does not. The Court is therefore not persuaded that this was unlawful." (Italics added.)

DSS argues: "As the trial court correctly held [citation], there is nothing improper about the ALJ considering evidence of incidents that had previously been determined by investigators to be unsubstantiated or inconclusive, particularly where, as here, the ALJ was able to consider additional evidence that was not before the investigators." DSS also points out that *Saraswati v. San Diego* has no application here. We agree on both counts. Accordingly, we affirm the trial court's determination that the weight of the evidence supported the ALJ's determination.

### D.    *Khoshaba Did Not Rebut the Presumption of Regularity as to DSS's Investigative Documents.*

Khoshaba argues that the facially erroneous designation of a few of DSS's documents and reports (dated between 2017 and 2019) as "COVID related," discredits DSS's evidentiary showing in this matter in its entirety. In a short argument in her petition for writ of mandate before the trial court, Khoshaba contended that "the Department's listing of multiple events from 2017-2019 as 'COVID related' is highly relevant evidence of 'irregular' performance of official duties." On appeal, Khoshaba argues, as she did in the trial court, that the documents in question "demonstrated a 'time or method of preparation' which rebutted the presumption of regularity" afforded to government documents. (Evid. Code, §§ 664, 1280.) Khoshaba challenges, as an abuse of discretion, the trial court's determination that the erroneous designation of the documents at issue, while "mystifying," did not "infect the entire integrity of the documents provided."

DSS responds to Khoshaba's argument that the documents with the facially erroneous "COVID related" designation rebut the presumption of regularity as follows: "The trial court properly found that the incorrect 'COVID-related' designation on these documents 'does not infect the entire integrity of the documents,' and in any event the

court also found that even without these documents, 'there is sufficient direct evidence to show multiple incidences of personal rights violations and overcapacity violations.' "

DSS adds: "The trial court's finding is supported by substantial evidence. Each of the incorrectly marked documents is accompanied and corroborated by other official documents, completed on or around the same date, that contain similar and additional details pertaining to the cited violation. [Citations.] Furthermore, witness testimony corroborates the May 2022 personal rights violation. [Citation.]."

DSS further states: "Though the Department made an error in incorrectly designating these documents as COVID-related, there is no indication that there was any error in the documents' information concerning Khoshaba's violations, and the trial court's findings and judgment are sufficiently supported by substantial evidence in the record with or without these documents."

Preliminarily we note that the documents at issue were admitted into evidence at the administrative hearing and Khoshaba has not provided any citations to the record to show that she timely challenged, during the hearing, admission of the documents on the basis they were untrustworthy. Nor has Khoshaba shown that the admission of the specific documents at issue was prejudicial. Finally, upon reviewing the trial court's thorough consideration of the issue, we conclude the trial court did not abuse its discretion, or otherwise commit reversible error, in rejecting Khoshaba's contention that DSS's evidentiary showing should be entirely discredited on the basis of the erroneously designated documents.

### E.     *The ALJ and Trial Court Properly Assessed Khoshaba's Credibility*

Khoshaba attacks, in a long and somewhat confusing argument, the ALJ's credibility determinations as to Khoshaba's testimony as well as the trial court's independent determinations as to the credibility of Khoshaba's testimony. We find no merit in Khoshaba's arguments on this point. There is ample evidence to support the trial court's finding that Khoshaba was not a credible witness.

***F.*** ***The Trial Court Properly Rejected Khoshaba's Argument That a Camera She had Installed After the Violations at Issue Had Occurred Precludes the Imposition of Any Discipline***

Khoshaba next argues that DSS "failed to proceed in the manner required by law because it failed to give 'due consideration' to [Khoshaba's] proposed indoor camera system," which would have served to correct the violations at issue. Khoshaba notes she had testified at the administrative hearing "that she had recently installed a new camera in the living room areas."

Khoshaba made a similar argument in the trial court, to which DSS had responded: "With regard to the notion that the introduction of video surveillance would sufficiently address the personal rights and regulatory violations within the daycare, [such] video surveillance does not serve as a remedy for the cited deficiencies. The installation of video surveillance will not guarantee that the children in Khoshaba's care are not harmed. Areas within the daycare, such as restrooms and private upstairs spaces, would be beyond the reach and, thus, such equipment would not effectively capture all pertinent incidents." DSS had further argued: "Again, and most importantly, Khoshaba's willingness to submit to video surveillance does not negate the fact that the previous incidents did occur and support the disciplinary actions against Khoshaba's license." DSS had also noted: "For these reasons, Khsohaba's claims that the Department failed to proceed in a manner authorized by law by failing to consider the voluntary camera installation is not a basis for granting writ relief." It also bears mention that camera equipment is subject to technical failure, has a limited purview, and can easily be disabled.

The trial court considered Khoshaba's arguments regarding the putative option to install cameras and her post-hoc installation of a camera in her living room. The trial court concluded: ""[Khoshaba's] claim that she is able to avoid further problems by installation of cameras is viewed by [DSS] as too little, too late. Part of this problem is that [Khoshaba] is not an accurate historian. Under [Khoshaba's] theory, any problems can be offset by maintaining cameras; this does not appear to be supported by legal

51.

authority and would result in no discipline being able to be imposed under almost any circumstances." We are not persuaded by Khoshaba's arguments and detect no error in the trial court's conclusion.

### G. The Trial Court's Finding that Khoshaba Violated the Personal Rights of Children in her Care is Supported by Substantial Evidence

Khoshaba challenges the trial court's affirmance of the ALJ's findings on allegations of two personal rights violations set forth in the accusation. The two underlying findings appear to be the ALJ's findings that (1) "[a] preponderance of the evidence established that [Khoshaba] violated Child 1's personal rights on May 17, 2022, by slapping and being physically aggressive with him, based on Child 1's mother's credible testimony and corroborating evidence"; and (2) "[a] preponderance of the evidence established that [Khoshaba] violated the personal rights of Child 2 and Child 3 on October 25, 2018, when she hit Child 2 on the lip in the presence of Child 3." As noted, we review the trial court's findings—express or implied—for substantial evidence.[9]

With respect to the May 17, 2022, incident alleged in the accusation (which was previously found to be substantiated at the agency-level by DSS), there is no doubt the

---

[9] In assessing whether substantial evidence supports the trial court's determinations, "[t]he doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).) "The doctrine is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error." (*Ibid.*)

To avoid the doctrine of implied findings, a litigant must secure a statement of decision under Code of Civil Procedure section 632 and, under Code of Civil Procedure section 634 must also bring to the trial court's attention, any ambiguities and omissions in the factual findings reflected in the statement of decision. (*Fladeboe*, *supra*, at pp. 58-59.) The doctrine of implied findings applies here because Khoshaba did not obtain a statement of decision, nor has she shown she timely requested one.

record contains substantial evidence to sustain the accusation. The mother of Child 1 testified at the administrative hearing that, upon arriving at the daycare to collect Child 1, she witnessed Khoshaba slapping Child 1. The mother reported the incident to the police on the day it occurred. A medical report prepared by hospital staff the next day indicates that Child 1 had "slight swelling" under his eye and "slight discoloration" on his jaw. Khoshaba's assistant testified she overheard Child 1's mother "scream" and saw her remove her child from the premises. The testimony of Child 1's mother, corroborating testimony of Khoshaba's assistant, and the medical report amply support a finding that Khoshaba violated the personal rights of Child 1 by being physically aggressive with him.

Khoshaba suggests that the swelling and bruising detected on Child 1 by medical staff were equally consistent with accidental injuries and the trial court did not properly consider this point. Khoshaba cites *Gonzalez. v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 75 (*Gonzalez*), in support of her argument. *Gonzalez*, which involved allegations of parental child abuse and implicated the parental privilege to administer corporal punishment, has a totally different context and is easily distinguished on that basis. (See *Gonzalez* at pp. 75-76 [noting that "the Legislature has recognized the right of parents to impose reasonable corporal punishment on their children as a legitimate disciplinary measure" and holding that "the record does not show that any consideration whatever was given to the parents' right to impose reasonable discipline on their children"].)

Khoshaba contends that under *Gonzalez*—which concluded the agency and superior court there erred in failing to consider the right of a parent to impose reasonable discipline on his or her child—the trial court was required to consider the possibility of accidental injury to Child 1. Khoshaba also notes that the *Gonzalez* court, in considering a parent's right to administer reasonable discipline on his or her child, observed that visible bruises "alone do not compel a finding of child abuse." (*Id*. at p. 93.) Khoshaba's

arguments are unavailing as *Gonzalez* is distinguishable in light of its specific context. Furthermore, as discussed above, other evidence besides evidence of bruising supports the court's finding of a personal rights violation as to Child 1. Khoshaba's attempt to analogize the instant matter to *Gonzalez* is not persuasive.

As for the trial court's affirmance of the finding that, in October 2018, Khoshaba hit Child 2's face in the presence of Child 3, it too is supported by substantial evidence. The allegation regarding this incident was previously found to be substantiated by DSS. The record discloses that this incident was investigated by DSS's Investigations Branch and the Investigation Case Report shows that Child 2, Child 3, and another child had all separately reported at various points, that Khoshaba hit Child 2. We conclude the report furnishes sufficient evidence to support the trial court's finding that a preponderance of the evidence shows that Khoshaba committed this personal rights violation against Child 2.

### H.    *Khoshaba Received a Fair Hearing; No Due Process Violation*

Khoshaba argues she was denied a fair trial. She argues her "due process rights of 'fair and unprejudiced decision-making and in being treated with respect and dignity' " were violated. She also argues, puzzlingly, that due process required "additional procedural protections," namely that she be allowed to continue to operate her daycare pending the completion of legal proceedings, upon "install[ing] video cameras to ensure and prove her compliance." We reject her contentions.

An ALJ must conduct an administrative hearing in a manner that is procedurally fair. (Health & Saf. Code, § 1596.842; *Clark v. Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1170 (*Clark*) [" 'an individual has the right to a tribunal "which meets … standards of impartiality" ' "]; *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*Doe*).) An ALJ may not have pecuniary and personal conflicts of interest with respect to the matter to be adjudicated or embody bias in the role. (*Clark,* at pp. 1170-1171.) Furthermore, a fair procedure generally requires " 'notice reasonably calculated to

apprise interested parties of the pendency of the action … and an opportunity to present their objections.' " (*Doe,* at p. 240.) In addition, the Administrative Procedure Act confers on parties to an administrative hearing, the right to call and examine witnesses, cross-examine opposing witnesses, impeach any witness, introduce exhibits, and rebut evidence. (Gov. Code, §§ 11425.10, subd. (a), 11513, subd. (b).)

The trial court specifically rejected Khoshaba's claims of bias. The court stated: "[Khoshaba] further argues that ALJ Reichmann must have been unconsciously biased against her since she spoke with a thick accent. This Court rejects that argument summarily. The words on the pages of the transcript, which have no accent, show the pattern that ALJ Reichmann observed." We detect no error in the trial court's conclusion. Khoshaba's argument that due process required that she be allowed to continue to operate her daycare upon installing cameras, is also unavailing.

## I.      *Miscellaneous Arguments*

To the extent Khoshaba's brief encompasses additional arguments not addressed above, we have determined those arguments are improperly raised, not adequately developed, or have no merit.

In a footnote in her opening brief, Khoshaba notes, in one sentence: "The trial court made no ruling on the issues raised by the petition under Code of Civil Procedure Section 1085." This argument, to the extent it is intended to be one, is not properly developed and is therefore forfeited.[10] (*Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 956 [when an appellant asserts a point " ' "but fails to support it with reasoned argument and citations to authority, we treat the point as waived" ' "].) In any event, we need not address arguments that appear in footnotes. (See *Holden v. City*

___

[10] Khoshaba's barebones reference to Code of Civil Procedure section 1085 in her reply brief does not alter our conclusion.

*of San Diego* (2019) 43 Cal.App.5th 404, 419-420 [courts need not address arguments made in footnotes].)

### J. Revocation of Khoshaba's License was Proper

Finally, Khoshaba argues that "the penalty imposed was clearly excessive." Khoshaba adds: "Most of all, [Khoshaba] consistently and vehemently denied all allegations of abuse or mistreatment [citations] and is willing to subject herself to maximum video surveillance to completely prove her innocence and compliance. At minimum, she should be given the opportunity to prove her defense, not least because any risk would be mitigated by the likely generation of indisputable video evidence." Khoshaba concludes that "[i]f the risk" at issue "is the possible infliction of 'slight swelling' or other minor injuries common in childhood, then there is no legal basis for [this] action, and the order must be set aside."

DSS responds: "Khoshaba's repeated violations justify the revocation of her license. The Department may revoke a day care license due to violations of its licensing requirements, and, upon revocation, it may exclude that individual from employment in or leadership of any day care facility in the future indefinitely or for a fixed term. ([Health & Saf. Code,] §§ 1596.773, 1596.885, 1596.8897, 1596.8898, subd. (a).)" DSS adds: "Substantial evidence supports the trial court[']s exercise of independent judgment in affirming the ALJ's determination that Khoshaba violated the Department's requirements and the revocation and exclusion of her license." DSS concludes: "Despite numerous citations, Khoshaba continued to violate the Department's requirements …. Thus, given the consistent and concerning pattern of Khoshaba's violations, revocation and exclusion were and are justified." We conclude DSS has the better argument.

### K. Conclusion

In light of the trial court's independent review of the administrative record and detailed analysis as set forth in its ruling, we see no basis for disturbing the trial court's judgment.

## DISPOSITION

The judgment is affirmed.  Each party to bear its own costs on appeal.


SNAUFFER, J.

WE CONCUR:


PEÑA, Acting P. J.


DE SANTOS, J.